UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

JOSHUA ESPINAL,

     Plaintiff,

vs.                                                                              CASE NO.:

THE ROD ROOM, LLC
Florida Limited Liability Company                    INJUNCTIVE RELIEF SOUGHT
d/b/a ROD ROOM

     Defendant(s).

## COMPLAINT

Plaintiff, JOSHUA ESPINAL (hereinafter "ESPINAL"), by and through the undersigned counsel, hereby files this Complaint and sues THE ROD ROOM, LLC, Florida Limited Liability Company, d/b/a ROD ROOM ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1.     This action arises from Defendant's failure to make Defendant's online platform located at www.rodroomfishing.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including ESPINAL, full and equal access to Defendant's products and services.

1

2. ESPINAL files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's products and services.

3. Accordingly, ESPINAL seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. *See also,* 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, West Palm Beach Division Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court for the Southern District of Florida in that a substantial part of the acts and omissions giving rise to ESPINAL's claims occurred in Palm Beach County, Florida.

6. Defendant attempts to, and indeed does, participate in Palm Beach County's economic life by offering and providing products and services over the internet to Palm Beach County's residents, but also extends it services to other residents within the state of Florida through its online presence, including ESPINAL, who is a resident of Flagler County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 301 East Blue Heron Blvd, Rivera Beach, Florida  33404 (hereinafter "Defendant's Principal Place of Business"), which is located in Palm Beach County, Florida.

8. ESPINAL was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9. ESPINAL is a natural person over the age of 18 and is blind.

10. ESPINAL is *sui juris* and is a resident of the State of Florida residing in Palm Coast, Florida, located in Flagler County.

11. ESPINAL is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, ESPINAL is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, ESPINAL uses screen access software to access digital content, like text messages, emails, and websites.

12. ESPINAL cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software

reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. ESPINAL's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. ESPINAL frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, ESPINAL uses commercially available screen reader software to interface with the various websites.

15. Defendant is Florida Limited Liability Company with a Principal Place of Business of 301 East Blue Heron Blvd, Rivera Beach, Florida 33404 (hereinafter "Defendant's Principal Place of Business").

16. Defendant's Website is an online platform through which Defendant markets and advertises Defendant's goods and services related to fishing, including rods, reels, bait, and related equipment, as well as services such as reel maintenance and repair; Defendant's Website further provides information regarding Defendant's offerings and directs customers to Defendant's

4

Principal Place of Business, where such goods and services are made available to the public. In order to access, research, or purchase Defendant's products and services, consumers may visit Defendant's online store located at Defendant's Website.

17.     Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website's development and maintenance.

18.     Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and it's implementing regulation as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as "place of public accommodation".

19.     There is a clear nexus between Defendant's Website and Defendant's Principal Place of Business, as Defendant's Website is used as a tool to advertise, promote, and facilitate the sale of Defendant's goods and services offered at Defendant's Principal Place of Business, specifically, Defendant's Website provides information regarding available fishing products, bait, and repair services, and directs customers to Defendant's Principal Place of Business to purchase such goods and obtain such services, thereby serving as an extension of Defendant's Principal Place of Business operations and encouraging customers to visit Defendant's Principal Place of Business.

20.     At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements

of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in Defendant's Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

### FACTUAL AND SUBSTANTIVE ALLEGATIONS

21.     ESPINAL is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22.     There is a direct nexus between Defendant's Website and Defendant's Principal Place of Business, as Defendant's Website functions as an online extension of Defendant's Principal Place of Business by advertising the same goods and services available at Defendant's Principal Place of Business, including fishing rods, reels, bait, and repair services. Defendant's Website provides details about these offerings and encourages customers to visit Defendant's Principal Place of Business to complete purchases, obtain services, and interact with Defendant's business, thereby integrating the online platform with the in-person retail experience.

23.     Defendants' Website is additionally used to search for brick and mortar store locations, check store hours and offerings, pricing, purchasing, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24.     The opportunity to search and pre-shop Defendant's merchandise and services through Defendant's Website, including reviewing available products, services, and business information, as well as signing up for electronic communications to receive offers, benefits,

exclusive invitations, and discounts for use at Defendant's Principal Place of Business, from his home are important accommodations for Plaintiff because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information or online features in a digital format that is accessible for use by blind and visually impaired individuals utilizing screen reader software, thereby limiting Plaintiff's ability to effectively use and navigate Defendant's Website.

25.     Like many consumers, ESPINAL accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. ESPINAL may view several dozen websites to compare features, discounts, promotions, and prices.

26.     ESPINAL utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27.     On or about the following dates, ESPINAL attempted to utilize Defendant's Website:

a.      January 18, 2026;

b.      January 30, 2026;

c.      February 17, 2026;

d.      March 07, 2026;

e.      March 25, 2026; and

f.      April 07, 2026.

(hereinafter "ESPINAL's Website Visits"). During ESPINAL's Website Visits, ESPINAL experienced substantial access barriers and, thus, was denied fair and equal access to same.

ESPINAL was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28.     While notice to Defendant is not required, ESPINAL sent a pre-suit communication on January 30, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29.     Prior to initiating suit, but following the sending of the pre-suit communications, ESPINAL has continued to attempt to utilize Defendant's Website during ESPINAL's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30.     However, Defendant's Website continued to contain access barriers that prevented free and full use by visually disabled individuals using keyboards and available screen reader software.

### VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31.     ESPINAL adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32.     On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from enactment of the statute to implement its requirements.  The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33.     Congress found, among other things, that:

8

a.  some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b.  historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c.  discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d.  individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e.  the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34.  Congress explicitly stated that the purpose of the ADA was to:

     a.     provide a clear and comprehensive national mandate for elimination of discrimination against individuals with disabilities;

     b.     provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

     c.     invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35.     Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

37.     More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled." [6]

39.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40.     Consistent with these policies, ESPINAL files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41.     Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

---

[2] 42 U.S.C. § 12188(b).

[3] 42 U.S.C. § 12188(a).

[4] Johnson, *supra* note 8.

[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[6] *Id.* (quoting *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

42.     There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides the contact information, operating hours, and access to products found at Defendant's Principal Place of Business and address to Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business providing users with the ability to search, review, and pre-shop Defendant's goods and services, obtain directions and location details for Defendant's Principal Place of Business, access information regarding available inventory and services offered at Defendant's Principal Place of Business, and facilitate a more efficient in-person visit to Defendant's Principal Place of Business, thereby directly linking the online platform to the goods, services, and physical location of Defendant's Principal Place of Business.

43.     Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44.     The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods,

services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47.      Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48.      According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49.      Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or

have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. ESPINAL, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50.    ESPINAL encountered barriers on each of ESPINAL's Website Visits. On or about January 18, 2026, ESPINAL initially attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of the Defendant's Website do not interface with ESPINAL's screen reader software. Specifically, features of Defendant's Website are inaccessible to ESPINAL's screen reader software, including, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

    a.    **Missing "Skip to Content" Link**

        i. **Issue:** The page does not provide a "Skip to Content" link to allow users to bypass repetitive navigation menus and jump directly to the main content area. Without this mechanism, keyboard and screen reader users are required to tab through every menu item and header link each time a new page loads, creating a significant accessibility barrier for those who rely solely on keyboard input or assistive technology for navigation. A visible or visually hidden "Skip to

Content" link should be present at the top of the page and become visible when focused, moving keyboard focus directly to the main content region, typically the <main> element, to ensure users can efficiently navigate and access key information.



ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** For users who are blind or have motor disabilities and rely on keyboard navigation or screen readers, the absence of a "Skip to Content" link means they must manually tab through every navigation item and header link on every page load before reaching the primary content. This repetitive and time-consuming experience creates a substantial barrier to independent and efficient use of the website, undermining equal access to information for individuals with visual disabilities.

b.      **Main Region Is Not Defined on the Page**

i. **Issue:** The main content region is not defined on the page using semantic HTML or ARIA landmarks. Without a programmatically identified main region, screen reader and keyboard users are unable to

15

quickly navigate to the primary content, and understanding the page structure or bypassing repetitive content becomes significantly difficult for assistive technology users. The primary content must be wrapped in a <main> element or an element with role="main", with only one such landmark present per page, excluding header and footer content, to ensure efficient navigation to core content.



ii.  **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii.  **Impact:** For individuals who are blind and rely on screen readers, the absence of a defined main landmark means they cannot use landmark navigation shortcuts to jump directly to the primary content of the page. Instead, they must listen to or navigate through all preceding content on every page, including headers, navigation menus, and other repeated elements, before reaching the information they seek. This creates a profound barrier to efficient and independent web use for users with visual disabilities.

c.      **Logo Image Has Incomplete Alternative Text**

16

i. **Issue:** The logo image is provided with incomplete alternative text that fails to convey all meaningful text and information presented visually. Screen reader users do not receive the same brand or contextual information as sighted users, and when important logo text or meaning is absent from the alt attribute, users relying on assistive technology are unable to fully understand the identity and context of the page. The logo image must include a complete and descriptive alt attribute that captures all meaningful visible text and branding information, including any text contained within the image, unless the logo is purely decorative.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** For users who are blind and depend on screen readers, incomplete alternative text on a logo image means they are denied equivalent access to the brand identity and contextual information that sighted users perceive at a glance. This inequity in information access can prevent blind users from correctly identifying the website or organization, undermining their ability to engage with the content confidently and on equal terms with sighted users.

17

**d.     Hidden Search Input Field Receives Keyboard and Screen Reader Focus**

i.  **Issue:** The hidden search input field located in the header section continues to receive keyboard and screen reader focus despite not being visible on the screen. This allows keyboard and screen reader users to tab to and interact with content that has no visible context, rendering navigation unpredictable and task completion unreliable. Hidden elements must be removed from the tab order and concealed from assistive technologies using appropriate techniques such as display: none, visibility: hidden, aria-hidden="true", or tabindex="-1", to ensure navigation remains predictable for all users.



ii.  **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii.  **Impact:** For individuals who are blind and navigate using a screen reader or keyboard, encountering focus on a hidden search input field creates significant confusion and disorientation. When focus moves to an element that is not visible, blind users have no means of understanding the context or purpose of that element, making it

extremely difficult to determine their location within the page or to complete intended tasks. This unpredictable focus behavior constitutes a serious barrier to effective and independent navigation for users with visual disabilities.

**e.      Redundant Links With Identical Destinations (Icon and Text Links)**

i.  **Issue:** The Facebook and Twitter icon links and their adjacent "Follow" text links all point to the same destination, resulting in the same target being announced multiple times to screen reader and keyboard users without any differentiation in purpose. This redundancy increases navigation effort unnecessarily and makes it difficult for users relying on assistive technology to understand the link structure of the page. When multiple elements link to the same destination, they must be consolidated into a single link or clearly differentiated by purpose, ensuring that only one interactive element is provided per action.



ii.  **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and rely on screen readers to navigate by links, encountering multiple redundant links pointing to the same destination means they must process and evaluate each repeated announcement to determine whether it represents a unique action or destination. This unnecessary repetition significantly increases cognitive load and navigation time, making it harder for blind users to build an accurate mental model of the page and to interact with content efficiently and independently.

f. **Facebook Icon Link and "Follow" Link Text Incorrectly Defined in a Single List Item**

i. **Issue:** The Facebook icon link and the adjacent "Follow" link text are incorrectly defined within a single <li> element, grouping multiple interactive elements in a manner that does not reflect a clear or accurate list structure. This structural deficiency prevents screen reader users from correctly determining the number of list items present and the distinct purpose of each link, rendering list-based navigation and comprehension effectively inaccessible for users of assistive technologies.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and rely on screen readers, the improper grouping of the Facebook icon link and the "Follow" link text within a single <li> element creates a significant and disorienting barrier. Screen readers convey list structure and item count to blind users as a primary means of understanding page organization; when multiple interactive elements are incorrectly consolidated into a single list item, blind users cannot accurately perceive the number of available links or determine the individual purpose of each. This misrepresentation of structure makes independent and accurate navigation of the list impossible. Each distinct link must be defined within its own <li> element and clearly associated with its purpose. Where links are functionally related, they must be grouped semantically — for example, through a single combined link or appropriately nested elements — without compromising list semantics, ensuring that list navigation and structural understanding are fully accessible to screen reader users.

g. **Heading Structure Is Not Defined on the Page**

i. **Issue:** The page does not implement a defined heading structure using semantic heading elements, depriving screen reader users of the navigational landmarks necessary to understand the page layout and the relationships between content sections. The absence of a logical heading hierarchy means that users of assistive technologies cannot efficiently identify, distinguish, or move between sections of the page, making content navigation and structural comprehension inaccessible.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and depend on screen readers, the absence of a defined heading structure represents a fundamental barrier to accessing and navigating page content. Blind users routinely rely on heading navigation — a core screen reader feature — to quickly scan a page, identify sections of interest, and understand the hierarchical relationships between content areas. Without semantic heading elements organized in a logical order, blind users are unable to determine where sections begin or end, how content is organized, or how to efficiently move through the page, making independent navigation effectively impossible. The page must implement proper

semantic heading elements (<h1> through <h6>) in a meaningful hierarchical order, with a single <h1> identifying the primary page topic, followed by appropriately nested <h2>, <h3>, and subsequent levels for subsections, ensuring content organization and navigation are fully accessible to screen reader and keyboard users.

h.     **Decorative Image Has Descriptive Alternative Text**

i.  **Issue:** A decorative image on the page has been assigned descriptive alternative text rather than being appropriately hidden from assistive technologies. Decorative images that convey no meaningful information must not be announced by screen readers, as doing so introduces unnecessary and potentially confusing content into the accessible experience, disrupting the clarity and efficiency of navigation for users of assistive technologies.



ii.  **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii.  **Impact:** For users who are blind and rely on screen readers, encountering descriptive alternative text on a decorative image introduces irrelevant auditory content into their browsing experience,

forcing them to process information that serves no meaningful purpose and does not contribute to their understanding of the page. This unnecessary announcement disrupts the flow of content, increases cognitive load, and can cause confusion about the relevance and structure of the information being conveyed, making accurate content comprehension more difficult. Decorative images must be hidden from assistive technologies by applying empty alternative text (alt="") or by rendering them as CSS background images, ensuring that screen readers skip such images entirely and that only meaningful, purposeful content is announced to non-visual users.

i.    **Decorative Image Gallery Carousel Is Exposed to Screen Reader and Keyboard**

i.  **Issue:** The decorative image gallery carousel is incorrectly exposed to both screen readers and keyboard navigation, causing purely decorative and non-informative content to be announced to assistive technology users and to receive keyboard focus. This introduces unnecessary noise into the screen reader experience and creates additional tab stops that serve no functional purpose, forcing users to navigate through meaningless content and significantly impeding their ability to interact with and understand the page.



ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** For users who are blind and navigate using screen readers and keyboard input, the exposure of a decorative image gallery carousel to assistive technologies creates a disorienting and burdensome experience. Blind users must listen to announcements for content that carries no informational value and must tab through focus stops that serve no meaningful function, unnecessarily increasing the time and effort required to navigate the page and locate relevant content. This forced interaction with irrelevant elements makes efficient and independent use of the page effectively impossible. Decorative carousels and their associated images must be hidden from assistive technologies using empty alternative text (alt="") or CSS-based implementation, and all non-essential interactive controls must be removed from the keyboard tab order, ensuring users are not compelled to engage with content that does not contribute to their understanding or use of the page.

j.   **New Window Behavior Not Defined on Social Media Links**

i. **Issue:** The social media links on the page open in a new browser window; however, this behavior is not communicated to users through visible text, accessible names, or any other programmatic means. Screen reader and keyboard users are provided no advance notice that activating these links will open a new browsing context, leaving them without the information needed to anticipate the change and maintain orientation within their browsing session.



ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and rely on screen readers, the failure to communicate that social media links open in a new window creates significant disorientation and confusion. When a new window opens without warning, blind users may lose track of their position within the original page, be unable to determine why their browsing context has changed, or mistakenly believe the original page has been altered or replaced. This unexpected behavior disrupts the user's mental model of the browsing session and can make it extremely difficult to return to the original page or continue navigating

purposefully, rendering confident and independent navigation effectively impossible. All links that open in a new window must clearly communicate this behavior to users through visible text or an accessible name announced by assistive technologies, enabling users to make an informed decision before activating the link and ensuring navigation remains fully accessible to those relying on assistive technologies.

51.     Defendant's Website was subsequently initially audited by Plaintiff's expert, Till Paris, on January 21, 2025, and who confirmed the access barriers that ESPINAL had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert during this initial audit are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers rendered Defendant's Website inaccessible to users who are blind and visually disabled, including ESPINAL.

52.     Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

53.     Here, however, ESPINAL, through counsel, did send a pre-suit communication informing of the barriers to access on January 30, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

54.     On or about April 07, 2026, ESPINAL again attempted to access and/or utilize Defendants' Website, but again was unable to enjoy full and equal access to Defendants' Website and/or understand the content therein because numerous portions of Defendants'

Website do not interface with ESPINAL' screen reader software. Specifically, features of Defendants' Website are inaccessible to ESPINAL'S screen reader software, include, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

    **a.**    **Missing "Skip to Content" Link**

      i. **Issue:** The webpage lacks a "Skip to Content" link that enables users to bypass repetitive navigation menus and directly access the main content area. Without such functionality, keyboard and screen reader users are compelled to navigate through each menu item and header link upon each page load, significantly hindering efficient access to primary content. This omission constitutes a substantial accessibility barrier, particularly affecting users who rely exclusively on keyboard or assistive technology.



      ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

      iii. **Impact:** The absence of a "Skip to Content" link severely impedes the ability of visually impaired users, including those who are blind, to bypass repetitive navigation and access core information swiftly.

The necessity to tab through every navigation link compounds the difficulty of accessing content efficiently, imposing an undue burden on individuals dependent on assistive technology.

**b.**      **Main Region Is Not Defined on the Page**

i. **Issue:** The main content region is not delineated on the webpage using semantic HTML or ARIA landmarks. This omission impedes screen reader and keyboard users from efficiently navigating to the primary content. Without a programmatic main region, understanding page structure and bypassing repetitive content is unfeasible for users of assistive technology.



ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** The absence of a defined main content region poses a significant barrier for visually impaired users, notably those who are blind, as it prevents them from quickly accessing the primary content. This oversight complicates navigation and comprehension of page layout, effectively restricting access to essential information for those relying on assistive technologies.

29

**c.**     **Logo Image Has Incomplete Alternative Text**

i.  **Issue:** The alternative text for the logo image is incomplete, failing to convey all meaningful visual information and text. This deficiency presents a barrier for screen reader users, who are deprived of equivalent brand or contextual information available to sighted users. The absence of critical logo text or meaning obstructs non-visual users from understanding the page identity.



ii.  **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii.  **Impact:** Incomplete alternative text for the logo image hinders the ability of visually impaired users, especially those who are blind, to comprehend the brand or context fully. This lack of descriptive alt text denies them access to the same identity cues provided to sighted users, impairing their ability to understand and engage with the website's content.

**d.**     **Hidden Search Input Field Receives Keyboard and Screen Reader Focus**

i. **Issue:** The hidden search input field in the header inadvertently receives focus from both keyboard and screen reader users. This issue creates a barrier, as users can interact with non-visible content, leading to unpredictable navigation and task completion challenges without visual cues.



ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** The focus on hidden search fields obstructs visually impaired users, particularly those who are blind, by introducing unpredictability in navigation and interaction. This unpredictability complicates their ability to complete tasks efficiently, as they may engage with content not visually present, leading to confusion and inefficiency in accessing information.

e. **Redundant Links With Identical Destinations (Icon and Text Links)**

i. **Issue:** The Facebook and Twitter icon links, alongside the adjacent "Follow" text link, direct to the same destination, creating redundancy. This redundancy poses a barrier for screen reader and keyboard users by announcing identical links multiple times without a

31

distinct purpose, thereby increasing navigation complexity and obscuring link structure understanding.



ii. **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** Redundant links to the same destination impose navigation challenges for visually impaired users, especially those who are blind. Repeated announcements of the same link add unnecessary complexity to navigation, making it difficult to discern link structure and hindering efficient access to content through assistive technology.

f. **Facebook Icon Link and "Follow" Link Text Incorrectly Defined in a Single List Item**

i. **Issue:** The Facebook icon link and the adjacent "Follow" link text are improperly encapsulated within a single <li> element, causing an obstruction for screen reader users. This results in multiple interactive elements being inappropriately grouped, obscuring the list structure. Users of assistive technologies face challenges in discerning the number of items or understanding each link's purpose, thus rendering navigation impracticable.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** The failure to properly define each list item separately within its own <li> element obstructs screen reader users, making it difficult for them to interpret the list structure or comprehend the functionality of each link. This issue prevents individuals with visual impairments, particularly those who are blind, from navigating effectively, as they cannot ascertain the number of items or their respective purposes. Therefore, the integrity of the list's semantic structure is crucial for ensuring accessible navigation.

g. **Heading Structure Is Not Defined on the Page**

i. **Issue:** The absence of a defined heading structure owing to the failure to use semantic heading elements presents a significant barrier for screen reader users. Headings are essential for users to grasp the page's layout and to navigate content. Without a structured hierarchy of headings, the identification of sections and understanding of content relationships become exceedingly arduous for users relying on assistive technologies.

33



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** The lack of a semantic heading structure severely impacts users with visual disabilities, especially those who are blind, as they rely on a coherent heading hierarchy for efficient navigation. This deficiency hinders their ability to locate and understand sections or content relationships, which are vital for meaningful interaction with the webpage. Implementing a logical heading structure enhances navigability and clarity for assistive technology users.

h.      **Decorative Image Has Descriptive Alternative Text**

i. **Issue:** The visual label accompanying a destination does not have a programmatic association with its relevant input field, creating a barrier for screen reader users. Consequently, the input field is announced without context, preventing users from comprehending its purpose or knowing what information is needed.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** The misplacement of a label that is visually present yet not programmatically associated with its input field impedes screen reader users, particularly those who are blind, from understanding the input's purpose. This omission makes it impossible to determine the required information, necessitating proper association to facilitate accurate and purposeful interaction.

i. **Decorative Image Gallery Carousel Is Exposed to Screen Reader and Keyboard**

i. **Issue:** The exposure of a decorative image gallery carousel to screen readers and keyboard navigation generates barriers for users by introducing unnecessary noise and additional tab stops. As a result of this exposure, users must navigate through content that lacks meaning, complicating their understanding and use of the page.

35



ii.  **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii.  **Impact:** The inclusion of non-essential decorative elements within the focus and navigation order creates significant challenges for users of assistive technologies. Blind users, among others, must expend additional effort to bypass irrelevant content, which disrupts the logical flow of navigation and diminishes overall usability. Ensuring decorative elements are hidden from assistive technologies mitigates this problem, facilitating clearer and more efficient navigation.

**j.    New Window Behavior Not Defined Social Media Links**

i.  **Issue:** The omission of communication regarding the opening of social media links in a new window poses an obstacle for screen reader and keyboard users. The lack of notification about this behavior can lead to disorientation, as users might mistakenly believe that the original page has changed, complicating navigation.

ii.  **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** The failure to clearly communicate the behavior of links opening in new windows significantly impacts users who rely on assistive technologies. Blind users, in particular, can lose their orientation and encounter increased difficulty when navigating, as they are not forewarned of the new browsing context. Proper notification is essential for ensuring informed interaction and maintaining navigational coherence.

55.     Additionally, ESPINAL' expert again audited Defendant's Website on April 08, 2026, and again confirmed the access barriers that ESPINAL encountered do in fact exist. Mr. Paris determined the issues with the website persist and these persistent issues would be a barrier to individuals with low to no vision. Mr. Paris performed a Re-Test Audit based on this April 08, 2026 evaluation. The identified access barriers found on Defendant's Website by Plaintiff's Expert during this April 08, 2026. Evaluation are further set forth in "Composite Exhibit 1."

56.     More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

57.     There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make Defendant's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

58.     Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities,

37

privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

59.     To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraphs 50, 51, 54 and 55 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as ESPINAL, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

60.     As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

61.     Because of the inadequate development and administration of the Defendant's Website, ESPINAL is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

62.     Enforcement of ESPINAL's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

63.     ESPINAL has retained the undersigned counsel for the pursuit, filing and prosecution of this action. ESPINAL is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

64.     Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant ESPINAL appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through the Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, ESPINAL requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G.      An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H.      An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.      An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J.      An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K.      An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L.      Such other and further relief as the Court deems just and equitable.

Dated: April 29, 2026                              Respectfully submitted,


                                        **ADA LEGAL TEAM, LLC**

42

 

/s/ Gregory S. Sconzo
Gregory S. Sconzo       #0105553(FL)
Kevin W. Puckett       #70706(MO)
4700 Belleview Avenue, Suite 100C
Kansas City, Missouri 64112
Phone: (816) 890-9599
Facsimile: (816) 203-8590
greg@ADALegalTeam.com
kevin@ADALegalTeam.com

**ATTORNEY FOR PLAINTIFF**

42